IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

MASTER OOGWAY, LLC, a Colorado limited liability company,

    Plaintiff,

v.

TOM LIITTSCHWAGER, individually;
GREG LEFEVRE, individually; and
NEW SOUTHWEST DOOR COMPANY, INC., an Arizona corporation.

    Defendants.

## COMPLAINT

Plaintiff, Master Oogway, LLC, by and through its undersigned attorney, and pursuant to 28 U.S.C.A. § 1332, brings this action against Defendants, Tom Liittschwager, Greg LeFevre, and New Southwest Door Company, Inc., jointly and severally, as set forth below:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff, Master Oogway, LLC ("Owner"), was and is a Colorado limited liability company authorized to do business in the state of Colorado, with a principal street address of 101 E. Colorado Ave., 201A, Telluride, Colorado 81435.

2. At all times material to the allegations herein a non-party, Architectural Traditions, LLC ("AT"), was an Arizona limited liability company, with an address of 9280 E. Old Vail Rd., Tucson, Arizona 85747.

3. AT was a member managed limited liability company.

1

4. At all times material to the allegations herein, Defendant New Southwest Door Company, Inc., along with an individual named Tracey Edgemon, were the sole members of AT.

5. Defendant New Southwest Door Company, Inc. ("NSDC") is an Arizona corporation. Upon information and belief, NSDC held the majority of the membership interest in AT and did, or had the ability to, control the management decisions of AT.

6. At all times material to the allegations herein, Defendant Tom Liittschwager ("Liittschwager") was the President of AT and, upon information and belief, is a resident of the state of Arizona.

7. At all times material to the allegations herein, Defendant Greg LeFevre ("LeFevre") was the Vice President of sales and marketing of AT and, upon information and belief, is a resident of the state of Arizona.

8. Jurisdiction in this action is based on Diversity of Citizenship of the parties under 28 U.S.C.A. § 1332.

9. Venue is proper in this District under 28 U.S.C.A. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred, or a substantial part of property that is the subject of this action is situated, in this judicial district.

**GENERAL ALLEGATIONS**

Each of the allegations below are, unless otherwise stated, hereby incorporated into each of the claims for relief set forth in this pleading.

**MISREPRESENTATIONS, OWNER'S RELIANCE, AND IMPROPER USE OF OWNER'S FUNDS**

10. Plaintiff, Owner, is the owner of certain property located on Lot 413, 137 Hood Park Road, in Mountain Village, Colorado ("the Property").

11. Owner is in the process of having a home constructed in Mountain Village, Colorado by a general contractor known as Gerber Construction ("Contractor").

12. On or about August 21, 2012, AT, through its authorized Colorado "Dealer," JB Window Specialties, and in an effort to solicit business in Colorado, notified local contractors on Colorado's western slope that AT "… will have their mobile showroom trailer in Telluride … and we invite you to stop by … and view some of their fine products…."

13. On or about February 7, 2013, and in an effort to solicit Owner's Colorado Contractor to contract with AT for doors and windows to be installed in Contractor's Colorado projects, Defendant LeFevre wrote to Contractor and represented that "Architectural Traditions has been in business for nearly 30 years … we have a very experienced team … product development, engineering, project management, and production personnel … 140 employees in a 200,000 square foot production facility ... We are owned by Diamond Ventures; a private Tucson based Investment Company with extensive business and real estate holdings." Upon information and belief, these representations were designed to solicit business for AT by promoting it as a stable and financially solvent company.

14. On May 29, 2013, Owner entered into a construction contract with Contractor for the construction of a single family residence (the "Home") on the property located in Colorado.

15. On June 3, 2013, in response to bids solicited by Contractor for the windows and doors needed for the Owner's Colorado Home, AT submitted a proposal to deliver and supply to Owner's Home in Colorado certain windows and doors and provide an "onsite Architectural Traditions Technician during installation to consult and verify installation methods … (provide) complete shop drawings…," and have their local agent "… render services as needed as

3

Architectural Traditions local Colorado Sales and Service Representative." A copy of this proposal is attached hereto as **Exhibit A**.

16. On June 14, 2013, and in reliance on the representations of AT's ability to perform, its ownership, and its financial strength, Owner authorized Contractor to enter into a subcontract with AT which was entitled "Contractor-Subcontractor Construction Contract" (the "Subcontract"), attached hereto as **Exhibit B**.

17. The Subcontract provided the project address in Mountain Village, Colorado, and required AT, *inter alia*, to deliver windows and doors to the Home; to perform any and all warranty obligations by correcting defective or non-conforming materials; to provide a representative at the project site in Colorado for inspecting and accepting all goods; to attend site meetings upon notice; indemnification of Owner and Contractor against any payment claims by AT's "subcontractors … suppliers" and others; to have an "on-site AT technician during initial installation to Sonult and verify installation methods"; to have its on-site AT technician "... render services as needed as AT's local Colorado sales and service representative"; to be responsible for "damaged, lost or stolen goods due to AT's negligence"; to obtain any specialized permits which may be necessary for AT's work; and to submit payment applications to the Contractor in Colorado. Additionally, the Subcontract provided that any dispute would be governed by "the internal laws of the State of Colorado."

18. Pursuant to the Subcontract, AT was to produce and deliver to the Owner's Home in Colorado "thermal steel windows and doors; fixed windows, inswing hopper windows, an inswing casement window, inswing French doors, and an outswing bifold door" (hereinafter "Windows and Doors").

19. The Subcontract required payment of a fixed sum of $561,000.00 to be paid as follows: $84,000.00 to start shop drawings; $196,000.00 "prior to production"; and $281,000.00 at delivery. All payments were subject to five percent (5%) retainage.

20. Upon information and belief, AT's performance of its Subcontract obligations in turn required it to purchase materials from suppliers, including but not limited to, wood, sealants, glass, hardware, fasteners, locksets, stains and paints; and to hire certain sub-subcontractors to perform services, including but not limited to, glazing, powder coating, painting, and laser cutting; and to pay AT's Colorado representative, JB Window Specialties, for onsite quality control and consulting during the installation process at the Owner's Colorado Home.

21. On July 16, 2013, and pursuant to the terms of the Subcontract, the Owner paid AT, through checks written in Colorado and disbursed by Owner's Colorado-based disbursing agent, $79,800.00 for the creation of shop drawings to be used in the production of the Windows and Doors.

22. On October 2, 2013, AT, through Defendant LeFevre, required the payment of its invoice for the "production deposit" as a condition of beginning production of Owner's Windows and Doors.

23. On October 29, 2013, the Owner paid AT, through two checks written in Colorado and disbursed by Owner's Colorado-based disbursing agent, each in the amount of $93,297.34, the sum required for production of $186,594.68.

24. Despite receiving $266,394.68 from the Owner ("Owner's Funds"), AT never produced or delivered any of the Windows and Doors.

25. The Subcontract provided that at any time AT could be compelled to furnish evidence of AT's ability to perform and complete its work in a timely manner, to furnish evidence of invoices for materials used in the production of the Windows and Doors, and that it could be terminated "at any time" if AT was failing to properly and diligently prosecute the work of the Subcontract, or was the subject of receivership proceedings or committed any act of insolvency.

26. The Subcontract allowed the Contractor upon termination of the Subcontract the right to enter AT's facilities, take possession of all of AT's materials and tools necessary to complete the work, and recover from AT damages and expenses related to the breach of the Subcontract. The rights set forth in this and the preceding paragraph are collectively referenced below as the "Subcontract Rights."

27. On November 20, 2013, Defendant LeFevre represented to Owner's Contractor that AT would ship the first truckload of Windows and Doors during the week of February 24, 2014.

28. On January 7, 2014, and in response to an inquiry from Contractor regarding the status of the shipment, Defendant LeFevre represented the delivery of Owner's Windows and Doors were "about a week behind" and that they would be shipped "the week of March 3."

29. On February 5, 2014, Defendant LeFevre represented to Contractor that "the ship date has slipped … currently looking at shipping the first truck March 21 … (and that) the delay is due to bottlenecks in our engineering department…."

6

30. On March 3, 2014, Defendant LeFevre represented to Contractor that "our engineering department continues to be a bottle neck ... Your order is just now going to the laser cutter; we are looking at a 4-25 ship date."

31. Defendant LeFevre intentionally or negligently misrepresented the reason for AT's inability to deliver Owner's Windows and Doors as being caused by "bottle necks" in AT's engineering department rather than disclosing the true reason which was a lack of funds to pay both company operating expenses and production costs for customers' orders, including Owner's Windows and Doors.

32. On March 7, 2014, and in response to Contractor's inquiry (designed to mitigate the impact of the delay in getting the Windows and Doors) of whether some of the "A" doors could be shipped first, Defendant LeFevre represented that, "We will definitely be able to ship these sooner. We are working on getting commitments from our laser cutter on exactly when we can receive these skins … Right now looking at around April 7 ship date."

33. On March 11, 2014, Defendant LeFevre represented to Contractor that "Production is confirming an April 11 ship date on the 6 ea. A windows."

34. On April 8, 2014, AT, through its members and managers, made the decision to cease operations effective at the end of that week because of AT being unable to pay its accrued debt (described in more detail below) consisting of, *inter alia*, institutional loans, rent, taxes, its operating overhead and the costs of producing customers' orders, including the order of Owner.

35. On April 14, 2014, in an email sent to "all clients," AT provided notification that it was closing its business, effective that same day, and that any deposits "will not be paid at this time as all funds have or are being used to close operations."

7

36. Defendant LeFevre's representations, and the later failure to correct those representations, were intended to induce reliance on the part of the Plaintiff, first to authorize the Subcontract, and later to induce the Owner to not compel the exercise of the Subcontract rights by effectively representing that the Owner's Funds were being used for the production of the Windows and Doors ordered for Owner's Home.

37. Defendant LeFevre either knew or reasonably should have known, both prior to the Subcontract and during all or a portion of the time that he was making the representations above, that AT was not owned by Diamond Ventures, that it was not financially stable, and that the Owner's Funds were not being used for the production of the Owner's Windows and Doors.

38. Defendant LeFevre had a common law duty to refrain from supplying false information to others for the guidance in a transaction involving a pecuniary interest, either intentionally or negligently, by failing to exercise reasonable care in obtaining the information.

39. Defendant LeFevre had a common law duty to correct the false information he provided and to not continue to conceal the truth from Owner or its Contractor.

40. At all material times to this action, Defendants NSDC, Liittschwager and LeFevre, knew or reasonably should have known, of AT's inability to produce and deliver the Windows and Doors for Owner's Home and pay its regular operating debt, including but not limited to the debts listed below, without a new infusion of operating capital.

41. At all material times to this action, Defendants NSDC, Liittschwager and LeFevre, knew or reasonably should have known that the Owner's Funds, and those of other similarly situated owners and contractors who had made deposits for windows and doors, were

8

being used to pay general operating expenses and company debt rather than using those funds to pay for the projects, including Owner's Home, for which those funds were intended.

42. Upon information and belief, even after the management and members of AT knew that the company could not perform its production obligations for Owner's Home, the management and members made the decision to use Owner's Funds to continue paying AT's operating, loan, and rent debt, and even its legal expenses, officers' salaries and expenses to close down AT.

43. Defendant LeFevre knew or reasonably should have known that the reason for the delay in delivery of Owner's Windows and Doors was based, in whole or in part, on AT's inability to both pay its company debt and expenses and pay the costs of producing its customers' orders, including Owner's Windows and Doors.

44. Upon information and belief, Defendants NSDC and Liittschwager knew of and participated in the decision to use Owner's Funds, and those of other similarly situated owners and contractors, to pay the general operating expenses and debts of AT rather than to devote those funds to the production and delivery of the windows and doors for which they were intended; the participation of these Defendants consisted of their knowledge, endorsement, ratification, and/or approval of these decisions.

45. Upon information and belief, Defendants NSDC and Liittschwager knew of or reasonably should have known of, and did participate in, the representations and failures to correct misrepresentations of Defendant LeFevre. The participation of these Defendants consisted of their knowledge, endorsement, ratification, and/or approval of these representations and the failures to correct the misrepresentations.

9

46. Owner was damaged by the tortious conduct of the Defendants because Owner had to pay for substitute windows and doors; therefore, being compelled to pay twice for the Windows and Doors for Owner's Home, and incur additional "cover" costs related to the new Windows and Doors which would have been avoided if the Windows and Doors ordered from AT had been produced and delivered.

47. Owner was further damaged by the tortious conduct of the Defendants because but for the misrepresentations and the failure to correct the misrepresentations, Owner could have directed his Contractor to exercise its contract rights to determine if AT could perform, was performing, had engaged and paid material suppliers, and had actually released certain of the Windows and Doors to the laser cutters, and Owner could have earlier terminated the Subcontract and recovered its deposits back as damages and/or exercised all other remedies under Colorado law, including pursuing a claim for a violation of Colorado's Trust Fund Statute, before Owner's monies were improperly used to pay AT's general business and close-down expenses.

48. Owner's damages were the direct and proximate result of the tortious conduct of the Defendants misrepresentations, failure to correct those misrepresentations, and improper use of Owner's Funds.

49. Owner's damages were reasonably foreseeable as a result of Defendants' tortious conduct.

**RECEIVERSHIP AND AT'S FINANCIAL POSITION**

50. Upon information and belief, Western Alliance Bank was the largest single creditor of AT, and it commenced a receivership action against AT.

51. As alleged above, by April 8, 2014, members and managers of AT made the decision to cease operations effective at the end of that week because AT was unable to pay its accrued debt (described in more detail below) consisting of, *inter alia*, institutional loans, rent, taxes, its operating overhead, and the costs of producing customers' orders, including the order of Owner.

52. The Superior Court of the State of Arizona entered an Order on May 27, 2014, appointing a receiver for AT's assets.

53. Upon information and belief and on June 5, 2014, the receiver took possession of AT's manufacturing facility.

54. Upon information and belief, at the time the receiver initiated a hold on AT's account in the early Summer of 2014, AT had only $29,945.00 in its general operating account.

55. Upon information and belief, at the time the receiver was appointed in May of 2014, AT had, *inter alia,* the following debts:

- $710,702.00 of debt to Western Alliance Bank;
- $210,075.08 of debt to AT's landlord;
- $211,742.69 of debt in warranty claims;
- $53,669.00 of debt for real estate taxes;
- $4,930,845.00 in debt in the form of deposits from approximately one hundred and twenty (120) customers for the production and delivery of windows and doors.

56. At the conclusion of the receivership, the receiver returned to Owner only $80,983.26 of the original $266,394.68 paid, resulting in Owner receiving nothing of value for its payments and suffering damages of no less than $286,451.00 comprised of the remaining

11

amount of Owner's deposit used improperly by AT and additional "cover" damages in excess of one hundred thousand dollars ($100,000.00) incurred by Owner in paying for replacement doors and windows and services related to those substitute products.  .

## FIRST CLAIM FOR RELIEF
### (Negligent Misrepresentation)

57. Defendants, jointly and severally, gave or endorsed, ratified or approved, the giving of false information, and further jointly and severally failed to cause that information to be corrected, as more specifically set forth above, to Owner and/or to its Contractor with the intention that it would be provided to and relied upon by the Owner in guiding its conduct by causing it to withhold seeking to enforce its rights under Colorado common law, Colorado's Trust Fund statute, and the Subcontract.

58. The Defendants misrepresentations and failure to correct the misrepresentations were given in the course of a transaction in which the Defendants had a financial interest.

59. Defendants were negligent in obtaining, communicating or allowing the information given to be communicated to the Owner and/or its Contractor, and in failing to correct the misrepresentations.

60. The Owner justifiably relied on the misrepresentations given, endorsed, ratified and/or approved by the Defendants.

61. Owner's reliance on the information supplied, endorsed, ratified and/or approved by Defendants caused damage to the Owner.

## SECOND CLAIM FOR RELIEF
### (Deceit Based Upon Fraud)

62. Defendants directly or through their endorsement, ratification or approval of the misrepresentations alleged above, made false representations of a past or present fact.

63. The misrepresented facts were material.

64. At the time the representations described above were made, Defendants either knew the representations were false, or were aware that they did not know if the representations were true or false.

65. Defendants made, authorized, endorsed, approved, or ratified the making of the representations with the intent that Owner would rely on the representations.

66. The Owner justifiably relied on Defendants' representations.

67. The Owner's reliance on Defendants' representations caused Owner to suffer damages.

## THIRD CLAIM FOR RELIEF
### (Civil Theft)

68. AT knowingly obtained control and use of Owners funds by deception both prior to and after Owner authorized its Contractor to enter into the Subcontract.

69. AT intended to permanently deprive Owner of the use and value of Owner's Funds.

71. AT's conduct damaged Owner and benefitted AT.

72. Defendants NSDC, Liittschwager and LeFevre participated in the deceptions regarding the financial solvency of AT and how Owner's Funds were being used, and participated in the improper use of Owner's Funds to pay AT's operating expenses and close-

13

down costs, by directly making, authorizing, approving, or ratifying these representations and improper use of funds.

73. Defendants' conduct constitutes civil theft entitling Owner to treble damages and recovery of attorney fees.

**FOURTH CLAIM FOR RELIEF**
**(Conversion)**

74. Defendants participated, as alleged more specifically above, in the taking and exercise of the use of Owner's Funds paid to AT.

75. Defendants participated, as alleged more specifically above, obtained, and kept Owner's Funds only as a result of the misrepresentations and deception described more specifically above.

76. Owner demanded return of its funds from AT.

77. AT, with the participation of Defendants, NSDC and Liittschwager, refused to return the Owner's Funds.

**FIFTH CLAIM FOR RELIEF**
**(Violation of Colorado's Trust Fund Statute)**

78. Non-party, AT, was a subcontractor as defined by Colorado law in that it contracted with Contractor in the express capacity of a subcontractor; in that agreed to perform services, supply materials, supply consultants; and because a significant portion of its work would have been performed by others who would have had lien rights against Owner's Property and Home.

79. Owner paid and authorized disbursement of its funds to AT for the purpose of paying for the production, delivery, and related services related to the Windows and Doors which were the subject of the Subcontract.

80. AT had a statutory duty to hold Owner's money in trust and use it only for the cost of performing the production, delivery, and related services which were the subject of the Subcontract, including, but not limited to, the payment for materials and services to be performed by AT's suppliers, sub-subcontractors, technicians and agents for materials, powder coating, laser cutting, and on-site oversight during initial installation to Sonult, and to verify installation methods.

81. Defendants NSDC and Liittschwager knew of, made, endorsed, approved, or ratified the decision to use Owner's Funds for the payment of AT's general expenses and facility operations.

82. Defendant LeFevre participated in the breach of the statutory duty by misrepresenting through the emails described above how the funds of the Owner were being used.

83. Defendants NSDC, Liittschwager and LeFevre, are individually and jointly and severally liable for the damages caused to Owner as a result of their participation in the tortious conduct of improperly using the Owner's trust funds to pay company expenses.

84. Defendants NSDC's, Liittschwager's and LeFevre's conduct constitutes a violation of C.R.S. § 38-27-127 (Colorado's Trust Fund Statute), and entitles Owner to treble damages and the recovery of attorney fees.

## SIXTH CLAIM FOR RELIEF
### (Violation of Colorado Consumer Protection Act)

85. Defendant LeFevre knowingly engaged in deceptive practices by, *inter alia*, representing that AT's goods and services would be provided to Owner and/or its Contractor while knowing that AT would not be able to provide its goods and services, which information was known prior to the entering into of the Subcontract and prior to the payment of Owner's Funds to AT, and by misrepresenting material information about how Owner's Funds were being used during a time when Owner had the ability to take action to recover its funds, with the intent that Owner would rely on Defendant's statements, representations and promises.

86. Defendants NSDC and Liittschwager participated in the deceptive trade practices of Defendant LeFevre through their knowledge, endorsement, ratification, and/or approval of his representations.

87. Defendants' deceptive trade practices occurred in the course of Defendants' business, vocation or occupation.

88. Defendants' deceptive trade practices significantly affected the public as actual or potential consumers of AT's goods and services in that, upon information and belief, substantially similar representations to those described above were made to various other consumers, i.e., owners and contractors, who suffered losses as a direct result of their reliance on those misrepresentations.

89. Owner was an actual consumer of AT's goods and services by being induced to authorize its Contractor to enter into a Subcontract with AT, and by authorizing disbursement of Owner's Funds to AT.

90. Defendants' deceptive trade practices caused actual damages or losses to Owner.

### SEVENTH CLAIM FOR RELIEF
(Civil Conspiracy)

91. Defendants NSDC and Liittschwager, and non-party AT, agreed by knowledge, words and conduct to improperly use Owner's Funds for purposes other than the cost of producing and delivering the agreed upon Windows and Doors; thereby, committing the offenses specified above.

92. Defendants NSDC, Liittschwager, and LeFevre agreed, by knowledge, words and conduct, to misrepresent how Owner's Funds were being utilized, the financial solvency of AT, and to fail to correct those misrepresentations.

93. Defendants committed the unlawful acts specified herein as a result of a common plan, scheme and design by non-party AT and Defendants to improperly use Owner's Funds for the payment of company expenses.

94. Owner was damaged by Defendants' conduct.

95. Defendants' are jointly and severally liable for Owner's damages.

### REQUEST FOR RELIEF

Plaintiff, Master Oogway, LLC, demand judgment against Defendants, Tom Liittschwager, Greg LeFevre, and New Southwest Door Company, Inc., jointly and severally, for compensatory damages, consequential damages, pre-judgment interest, court costs, attorney fees, and such other and further relief the Court finds to be just and proper under the circumstances of this case.

Dated: January 12, 2016.

*s/ Daniel A. Gregory*
Daniel A. Gregory, Reg. No. 22949
GREGORY, GOLDEN & LANDERYOU, LLC

        1199 Main Avenue, Suite 213
        Durango, Colorado 81301
        Phone: (970)247-3123
        Fax:  (970)247-8293
        E-mail: Daniel@daglaw.com
        ATTORNEY FOR MASTER OOGWAY, LLC

Plaintiff's Address:
101 E. Colorado Ave., 201A
Telluride, Colorado  81435